**UNITED STATES of America, Plaintiff,**

v.

**STATE OF NEW YORK, et al., Defendants.**

**No. 77–CV–343.**

United States District Court,
N.D. New York.

May 8, 1989.

James P. Turner, Acting Asst. Atty. Gen., John M. Gadzichowski and Martin Hacala, Attys., Civil Rights Div., Dept. of Justice, Washington, D.C., for plaintiff.

Robert Abrams, Atty. Gen. of State of N.Y., and Alan S. Kaufman, Asst. Atty. Gen., Albany, N.Y., for defendants.

**MEMORANDUM–DECISION
AND ORDER**

JAMES T. FOLEY, Senior District Judge.

The history of this lengthy and important litigation with reference to previous decisions and orders was most recently set forth in my Memorandum–Decision and Order, published in 112 F.R.D. 165 (N.D.N.Y. 1986); affirmed for different set of reasons, 820 F.2d 554 (2d Cir.1987). It is sufficient to state for present purposes that after a trial of twenty-four (24) days, in a decision of 255 findings of fact and 36 conclusions of law filed September 6, 1979, the allegations of the plaintiff United States charging discriminatory hiring practices of Troopers by the New York State Police with respect to Negroes, Spanish-surnamed Americans and females were upheld. In a separate Memorandum, I summarized and highlighted the findings of statutory violations, and briefly explained the reasoning and set forth the supporting case law for my extensive and serious rulings in 475 F.Supp. 1103 (N.D.N.Y.1979). That opinion and the full statement of the findings and conclusions have been published in 21 FEP (Fair Employment Practice Cases) 1286. The Final Decree in accord with my rulings was agreed upon and entered on October 19, 1979. No appeal was taken from this Final Decree.

As noted in the previous decisions the most important ruling was the direction to the state defendants to include in their future appointments to position of Trooper qualified Negroes and Spanish-surnamed Americans totalling approximately forty percent (40%) of each class until their total representation approximately reflected their composition in the relevant New York State labor market being estimated by the 1970 Census as 10.80% and 3.36% respectively.

There has been remarkable change over the years in the black and Hispanic representation in the New York State Police Division. In November, 1978, their representation was shockingly low being .97% and .80% respectively. As of October 19,

1988, the black and Hispanic representation was 9.2% and 6.3% respectively. Therefore, the black goal set in 1979 of 10.88% has been substantially met, and the 3.36% goal for Hispanics has been substantially exceeded. The total black and Hispanic representation in 1988 was 15.5%, which exceeded their combined percentage of 14.2% in the State's labor force, based upon the 1970 census relied upon by the Court for its long range goal. The 1980 census estimates in the State labor force a percentage of 12.33% for blacks, and 7.78% for Hispanics, totalling a combined percentage of 20.11%. As noted, the combined representation as of 1988 is 15.5%, more than two-thirds of the proportion of blacks and Hispanics in the relevant labor pool of the 1980 census.

The credit given in my September 24, 1984 decision for this much fairer representation, reported in 593 F.Supp. 1216, 1218 (N.D.N.Y.1984), is repeated:

> The attainment of the prescribed goal for representation approximating the percentage of the minority force in New York will soon be reached. The credit for this attainment must be accorded to the affirmative and continuing cooperation of the progressive Governors of New York State and the supervising officials and administrative staff of the New York State Police in the recruitment of minorities as mandated by the final decree. This Court is grateful for this splendid attitude of respect for and compliance with the decree.

The present motion for consideration is one filed by the Attorney General of New York, and his counsel, Assistant Attorney General Kaufman, for an order pursuant to F.R.Civ.P. 60, and Section II of the Final Decree dated October 19, 1979, modifying the 40% hiring goal of blacks and Hispanics to a figure to be set by the Court. The motion is supported by the affidavit of Thomas A. Constantine, Superintendent of the New York State Division of State Police and a Memorandum of Law. In his affidavit Superintendent Constantine states that a new compliance goal in the 20–25% range will insure that the interests of all concerned are fairly served and will contin-

ue the Division's firm commitment to affirmative action. The Memorandum of Law submitted by Assistant Attorney General Kaufman suggests that the 40% hiring goal be set in the 20–25% range thereby reflecting the proportion of blacks and Hispanics in the relevant labor market (based on the 1980 census) and the proportion these groups represent in the applicant pool (based on 1983 and 1986 recruitment figures). It is agreed by the attorneys for the parties that the Court has the power under the Final Decree and its inherent authority, in the exercise of its discretion, to modify the Decree. *Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 710 F.2d 69, 74 (2d Cir.1983); *Stotts v. Memphis Fire Department,* 679 F.2d 579, 585 (6th Cir.), cert. denied 459 U.S. 969, 103 S.Ct. 297, 74 L.Ed. 2d 280 (1982).

The State motion meets intense and vigorous opposition from the attorneys for the plaintiff United States of America. Its stated position in its Memorandum of Law is that it is in agreement with the State that the forty percent (40%) combined black and Hispanic remedial hiring goal for the position of Trooper is no longer warranted or justified, and cross moves the Court for its complete dissolution. The United States strongly opposes the State motion suggesting a modification in the compliance goal to a 20–25% range, on the ground that there is no basis in the record before this Court for the imposition of this new lesser range. The United States also cross moves for the dissolution of the ten percent (10%) remedial hiring goal for women on the ground it is substantially below the female proportion of both the female applicant flow and relevant labor pool, and is not remedial but may constitute an improper cap or ceiling. The United States also cross moves for an Order requiring the State defendants to comply with the Final Decree mandate and utilize a selection procedure for the entry-level of Trooper which is job-related or valid, or which does not have an adverse impact upon blacks, Hispanics and females. There is submitted for the United States a substantial affidavit of Attorney Gadzi-

chowski with attachment of exhibits relating to statistical information and relevant correspondence between the attorneys for the State and the United States.

Both sides agree that the forty percent (40%) remedial goal set by the 1979 Final Decree was justified and appropriate, producing a desired result for the good purpose of fair representation for minorities in the New York State Division of State Police. The affidavit of Superintendent Constantine lends firm support that a successful and needed transformation has taken place. The Superintendent with twenty-eight (28) years of commendable experience as a Trooper and in command positions of the uniform and the Bureau of Criminal Investigation operations, also has the important background of being at one time in charge of training new recruit Troopers at the State Police Academy. For a certain period he held an executive position supervising all Academy and Training operations and personnel programs for the State Police. His appraisal based upon this varied and impressive contact with State Police functions and personnel programs is entitled to serious consideration and acceptance. The Superintendent states his appraisal this way, that is, of course, most gratifying for the Court, in paragraph five (5) of his affidavit:

> Over the years, the wisdom of increasing minority representation in the State Police has been proven time and time again. As a result of our hiring practices as governed by the Final Decree, increased minority representation within our ranks has been beneficial in a variety of ways, including those cited by the Court as reasons for its issuance of the Decree. The Court's prophetic statement in its decision in 1979 has come true:

> > In a democratic society, a police force that includes a reasonable proportion of members from the various groups of people that it serves will have a better image with the public, will better be able to carry out its law enforcement functions, and will ensure full and fair utilization of human resources without regard to color of skin, origin of birth, or gender.

*United States v. State of New York,* 475 F.Supp. 1103, 1109 (N.D.N.Y.1979). We are a better police force now than we were ten years ago.

After serious review and consideration, it is my judgment now that the time has come to dissolve completely the forty percent (40%) appointment of blacks and Hispanics as directed in the Final Decree of 1979. There are several good reasons to support this judgment. The Final Decree of 1979 will be in existence ten years in October, 1989, and that is a substantial period of time. The United States Supreme Court has noted that the choice of remedies to redress racial discrimination is a balancing process. *United States v. Paradise,* 480 U.S. 149, 184, 107 S.Ct. 1053, 1073, 94 L.Ed. 2d 203 (1987). A race conscious plan cannot be "ageless in [its] reach into the past, and timeless in [its] ability to affect the future". *Wygant v. Jackson Board of Education,* 476 U.S. 267, 276, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1987). District Court orders should "operate as a temporary tool for remedying past discrimination without attempting to 'maintain' a previously achieved balance". *Sheet Metal Workers v. E.E.O.C.,* 478 U.S. 421, 479, 106 S.Ct. 3019, 3052, 92 L.Ed.2d 344 quoting from *United Steelworkers of America v. Weber,* 443 U.S. 193, 216, 99 S.Ct. 2721, 2733, 61 L.Ed.2d 480 (1979), (Blackmun concurring). It was also stated in *Weber,* at p. 208, 99 S.Ct. at 2729 that the approved Affirmative Action Plan is a temporary measure, not intended to maintain racial balance but simply to eliminate a manifest racial imbalance. Justice O'Connor in *Sheet Metal Workers* 478 U.S. at 496, 106 S.Ct. at 3061, stated that, as the plurality suggests, goals should generally be temporary measures rather than efforts to maintain a previously achieved racial balance, and should not unnecessarily trammel the interests of non-minority employees. The Second Circuit has ruled that a plan employing racial distinctions must be temporary in nature with a defined goal as to its termination. *U.S. v. Starrett City Associates,* 840 F.2d 1096, 1101 (2d Cir.1988). A 50% hiring goal was

upheld but it was also noted as important that the duration of such hiring quotas should be no longer than is necessary. *U.S. v. City of Buffalo,* 633 F.2d 643, 647 (2d Cir.1980).

Compelling support for the dissolution comes from the affidavit of Superintendent Constantine which evidences to my mind that the public image of the New York State Police is no longer affected and troubled by unfair representation of blacks and Hispanics in its ranks. Actually, that was the goal the Court wanted to reach when it formulated in 1979 its percentages for appointment of such minorities. As Attorney Gadzichowski stressed in his memorandum, and at the oral argument on the motions April 17, 1989, my decision in 1979 noted that the objective of the remedial provisions of Title VII is not to sanction a numbers game in and of itself, but rather to remove vestiges of discrimination deemed harmful to our democratic society. 21 FEP Cases at 1345. Further I agree with the United States position that there is no firm or persuasive basis in the record to reach out for some lower figure.

By no means should this complete dissolution of percentage appointment for minorities be viewed as a change of mind about the affirmative action concept that guided my adoption originally of percentages and goals in my 1979 decision and decree. The United States Supreme Court continues to approve affirmative action and remedial hiring goals in appropriate circumstances. *Local 28, Sheet Metal Workers v. E.E.O.C.,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *Wygant v. Jackson Board of Education,* 476 U.S. 267, 282–283, 106 S.Ct. 1842, 1851–52, 90 L.Ed.2d 260 (1986); *U.S. v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987); *Local Number 93, International Association of Firefighters v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). Affirmative action has been proven to be a worthwhile remedy in this instance because it made an outstanding State Police force a better one. The spirit, cooperation and good faith of the New York State Police and the New York Attorney General and his staff were exemplary, and should be role models for the accomplishment of important governmental interests in litigation of this kind.

Attorney Gadzichowski in a proposed order for the dissolution of the appointment percentage also requests that the State defendants be directed within not more than nine months from the date of entry of the order, to submit to the Court and the United States for review, a procedure for the entry-level of Trooper which the State has good reason to believe is job related or valid, or which will not have adverse impact upon blacks, Hispanics or women. It was recognized at oral argument of the motions that past examinations have such adverse impact and that there exists great difficulty in nationwide efforts to alleviate this result. Attorney Gadzichowski assured as stated in his proposed order that the State defendants may continue to use their current selection procedure, and if adverse impact to minorities and women resulted from the examination, methods could be achieved to avoid such adverse impact. Assistant Attorney General Kaufman responded that paragraph five (5) of the proposed order does not so state. I agree and direct that clarifying provisions should be agreed upon in this respect. Paragraph four (4) of my 1979 Final Decree directed the State defendants to continue their efforts in the development of job-related or validated examinations and other selection procedures that do not have adverse impact on minorities and women. The time has come in 1989 for concentrated efforts by the United States and State defendants in this respect. I am confident that the good faith cooperation between the parties that has marked this litigation from the beginning will work out this problem.

The United States in its cross motion to the motion of the State defendants moves also for the dissolution of the ten percent (10%) remedial hiring goal for the position of Trooper for women. There has been from 1979 to 1988, a substantial improvement in the hiring of women. In 1979 there were twenty-four (24) women for a percentage of 0.78% in the State Police Force, and in 1988 there were two hundred

ten (210) women for a percentage of 5.3%. It has been shown that the 10% remedial hiring goal for them is substantially below their applicant flow and presence in the relevant labor pool. There is no specific objection to this change by the State defendants, and inasmuch as it seems to be an unnecessary artificial cap, the dissolution of the 10% hiring goal for women is dissolved completely.

To summarize: The motion of the State defendants to the extent it requests a modification of the 40% hiring goal to a suggested lesser compliance figure in the 20–25% range is denied. The cross motion of the United States for the complete dissolution of the forty percent (40%) combined black and Hispanic hiring goal for the position of Trooper, and the dissolution of the ten percent (10%) remedial hiring goal for women for the position of Trooper is granted. An Order to such effect if agreed upon shall be submitted, otherwise settled on five (5) days notice.

It should be noted that a separate motion of plaintiff United States to compel production of documents pursuant to Paragraph 11 of the October 19, 1979 Decree was heard at the oral argument on April 17, 1989 and granted to the extent to allow the United States to inspect and receive a copy of the last Trooper examination. Such Order has yet to be submitted and is to include protective provisions for confidentiality, and the attorneys were directed to continue their efforts for agreement as to further production and inspection of pertinent records.

It is so Ordered.